[No. 28070.   Department Two.   December 9, 1940.]

J. A. VANCE *et al.*, *Appellants*, v. MUTUAL GOLD CORPORATION, *Respondent.*[1]

[1]Reported in 108 P. (2d) 799.

*W. H. Abel* and *O. C. Moore,* for appellants.

*E. D. Weller* and *D. B. Heil,* for respondent.

SIMPSON, J.—This appeal involved two actions brought against defendant, Mutual Gold Corporation.

In the first case, J. A. Vance, the Vance Lumber Company, W. G. Peebles, and Louise Woodward sought to recover judgment against defendant by reason of certain written agreements called production notes, issued by defendant to plaintiffs, aggregating sixteen thousand dollars. The complaint alleges that, during August, 1936, defendant borrowed from plaintiffs, giving its notes as evidence of the indebtedness, the following sums: J. A. Vance, eight thousand dollars; Vance Lumber Company, six thousand dollars; W. G.

Peebles, one thousand dollars; and Louise Woodward, one thousand dollars. It was further alleged that the notes given to plaintiffs provided that they would be paid "out of the net production accruing from the sale of ores from its mining property." Defendant, in its answer, admitted the giving of the notes as alleged in plaintiffs' complaint.

The second action was brought by J. A. Vance to recover for money advanced to defendant in the amount of $18,592.30 and for the sum of $302.34 on account of expenses incurred by plaintiff in the management of defendant's business. Plaintiff also sought to recover interest upon the amounts alleged to be due. Defendant answered and denied the allegations of the complaint, and then set up an affirmative defense as follows:

"That any monies expended by plaintiff as alleged in paragraph III and IV of the complaint on account of defendant was so expended without authorization by the defendant and without any agreement by the defendant to repay the same, and that it was the intention of the parties hereto that any monies expended by plaintiff under the contract set forth in the bill of particulars funished and filed by plaintiff herein would be repaid out of net production of the mining properties referred to in the complaint herein and not otherwise."

The reply put in issue the allegations contained in the affirmative answer.

The case was tried to the court, sitting without a jury. At the close of the trial, the court made findings of fact and conclusions of law favorable to defendant, and thereupon entered a judgment of dismissal. Plaintiffs in each case have appealed.

The assignments of error will be noticed as we proceed.

The evidence is not free from conflict, but we be-

lieve the following facts are fairly well established thereby. Respondent corporation was organized in the state of Washington during the month of May, 1932, for the purpose of engaging in the industry of mining. It purchased several mining claims in Mono county, California, the consideration being one hundred fifty thousand dollars, payable in installments, ten thousand dollars of which was paid as an initial payment.

Appellant Vance was one of the original stockholders. He was elected a director at the first meeting of the stockholders and served as vice-president until September 19, 1938, at which time he resigned.

During the summer of 1936, after considerable work had been done and a small stamp mill had been purchased and erected, the directors of the company found it very difficult to raise money from the sale of stock to start operations. August 22, 1936, a resolution was passed by the board authorizing the raising of thirty thousand dollars by the sale of common stock and production notes on the basis of forty shares of common stock of the par value of five cents per share and three dollars in face value of the production notes for three dollars. The form of the production notes was as follows:

"PRODUCTION CERTIFICATE

$............................................

Spokane, Washington

"FOR VALUE RECEIVED, the undersigned, a Washington corporation, agrees to pay to............................................ the sum of............................................Dollars, without interest, out of net production receipts accruing from the sale of ores from its mining property, before any dividends shall be declared or paid by it upon its capital stock, and in no other manner whatsoever, except that in case of a voluntary or involuntary sale of its mining property, any balance unpaid hereon shall be

paid out of the proceeds thereof before any distribution shall be made to its stockholders.

" 'Net production receipts' hereinbefore referred to shall be construed to mean such receipts as shall remain after deducting therefrom all of the costs of producing, handling and milling said ore, necessary corporation expenses and taxes, a reasonable sum for mine development, such sum as the Board of Directors shall determine may be necessary for the purchase and/or payment of necessary mining equipment, and payments on account of the purchase price of said mining property, by royalty or otherwise.

"All sums which the undersigned shall have for the retirement of this and similar certificates shall be applied pro-rata upon the same.

"The execution of this certificate has been authorized by resolution of the Board of Directors."

Appellant Vance had made a trip to the property prior to the meeting and had fixed the amount of thirty thousand dollars as ample to place the property in profitable production. He stated that he was willing to subscribe for a considerable portion of the production notes, provided he should be made general manager and placed in sole charge of the mine's operation. At a board meeting held September 23, 1936, it was found that the full amount of thirty thousand dollars had been subscribed, whereupon a contract was entered into with appellant Vance whereby he was made general manager of the operations of the mine. Shortly afterward, a modification of the contract for the purchase of the mine was obtained, under the provisions of which it was agreed that ore extracted in excess of eight dollars per ton should be applied on the purchase price; that ten thousand dollars should be paid on the contract November 1, 1937, and a like amount November first of each year thereafter until 1941, when the entire amount should become due.

Vance took charge of the mining property and con-

tinued its operations until April 22, 1938. During that period of time, he had received approximately forty-two thousand dollars from net mint returns, together with thirty thousand dollars raised from production notes and five thousand dollars supplied by stockholders. He conducted his operations in such manner that, in addition to the foregoing sums, he advanced from his own resources approximately eight thousand dollars to pay expenses of the operation and ten thousand dollars due on the purchase price of the property November 1, 1937. It is to recover these advances that the second cause of action was instituted.

During the winter of 1937 and 1938, Vance advised the other members of the board of respondent company that the property could not be operated successfully with the equipment then on the mining property. March 23, 1938, a meeting of the board was held for the purpose of considering ways and means for properly equipping the mine with satisfactory machinery. At this meeting, a resolution was passed empowering the members of the board to contact successful mining companies in an effort to sell a one-half interest in the mining property for the purpose of raising sufficient capital to place the mine on a paying basis. Vance voted for this resolution.

During June, 1938, appellant Vance employed a mining engineer named Robert J. Cole to examine the property. Mr. Cole, in company with Vance and his son Lloyd, made an examination of the mine and the other property belonging to respondent and thereafter reported to the board at a meeting held June 25, 1938. His report, among other things, showed that the mill then on the property was inadequate and could not be profitably run, that it would be necessary to erect an electric power line and replace the mill, which he referred to as a "pilot mill," and which had a capacity

of twenty-five to forty tons per day. He recommended the purchase of a used mill in California which had a capacity of one hundred fifty tons per day.

At the trial, he testified that, at the time he made the examination, he concluded it would take approximately one hundred thousand dollars to properly equip the property and furnish working capital to commence operations.

Finding that there was no money available, the board authorized Vance and Cole to interview the Sunshine Mining Company in an attempt to interest them in the purchase of a one-half interest in the property. Their efforts, however, were unsuccessful. Subsequent to their return from the interview with the officers of the Sunshine Mining Company, at a meeting of the board July 18, 1938, Lloyd J. Vance, a son of appellant Vance, proposed to form a new corporation and take over a one-half interest in the mining property, in consideration of which the new company would spend at least seventy thousand dollars in order to place the mine in a profitable production condition. The proposal provided for repayment of the money spent in this work, the payment of the balance of the purchase price, and all other expenses incident thereto, including the production notes and other indebtedness of respondent company, which were to be paid in stock of the new company. It was further proposed that the remaining net proceeds were to be divided equally between the operating company and respondent.

The board of directors called a stockholders' meeting for August 6, 1938, in order to consider this proposal or any other that might be suggested for financing the needed improvements. At this meeting, the stockholders present, represented in person and by proxies, owned stock in excess of two-thirds of that outstanding. Appellant Vance was personally present, and the

other appellants were represented by their proxies. After a discussion of the company's financial condition, the proposal of Lloyd J. Vance was rejected. Thereafter, the following resolution was adopted at the meeting:

"RESOLVED, that the Board of Directors of this corporation be and they are hereby authorized, empowered and directed to sell, lease, deal with, operate, exchange or otherwise dispose of, to any person, persons or corporation desiring to purchase, lease, deal with, exchange, operate same, any part of or all of the assets of this corporation, at such time or times, for such price and upon such terms and conditions, for cash or otherwise, including the exchanging for shares in another corporation, domestic or foreign, as they in their absolute discretion deem expedient, advisable or desirable, and to perform any other acts in this connection, which in their judgment they may deem necessary or advisable."

Some of the stockholders suggested that they would be able to secure a proposition from Frank A. Garbutt, of Los Angeles, California, which would be more advantageous to the company than the proposition of Lloyd J. Vance, in that Mr. Garbutt was financially able to carry out the operations and was a thoroughly competent mining man.

A meeting of the board of directors followed the stockholders' meeting. At that time, two of the directors were authorized by the board to go to Los Angeles and attempt to secure a contract with Mr. Garbutt. After several meetings had been had with Garbutt and the board of directors of respondent company, a contract was prepared and executed by Garbutt and respondent September 2, 1938, which provided that an operating company would be formed to which all the property belonging to respondent would be conveyed. Garbutt agreed to expend a minimum of ninety-five thousand dollars for equipment

and labor to place the property in an operating condition. It was agreed that, from the net production, there should be first paid to Garbutt the amount of his expenditures, the remainder of the purchase price to the owner, and thereafter the net proceeds should be divided in accordance with the stockholdings in the operating company.

During the time which followed the stockholders' meeting of August 6, 1938, appellant Vance objected to the consideration of any contract with Garbutt and demanded payment in cash of the money he had advanced voluntarily to pay company obligations, and also demanded payment of the amount he and the Vance Lumber Company had invested in production notes.

In the month of December, 1938, the Log Cabin Mines Company was formed in California as the operative company in accordance with the agreement with Garbutt. The respondent company then conveyed its property to the operating company. A three-party agreement was then executed between respondent, Garbutt, and the Log Cabin Mines Company. That contract provided for the carrying out of the terms of the original agreement with Garbutt by the Log Cabin Mines Company as operator, the funds therefor to be advanced by Garbutt in a minimum amount of ninety-five thousand dollars. It was further agreed that the ten thousand dollar capital stock of the Log Cabin Mines Company should be divided 5001 shares to Garbutt and 4999 shares to respondent.

Mr. Garbutt testified that, in August, 1939, he had advanced in excess of ninety thousand dollars in the construction of an electric power line, the erection of a new mill, and had added other equipment to the mill operation.

At the time of the commencement of the trial, a sup-

plemental agreement was entered into between respondent Garbutt and the Log Cabin Mines Company, dated August 23, 1939. The new agreement provided that, after repayment of the amount of Garbutt's advances, the balance of the purchase contract, and other necessary expenses, respondent's portion of the net profits should be used for the payment of its production notes and its other indebtedness before dividends should be made or declared to the stockholders of the respondent company.

We will first consider the question relative to recovery upon the so-called production notes.

Appellants admit that the notes were to be paid by respondent out of the net production receipts accruing from the sale of ores from respondent's mining property, but urged that, by making the contract with Garbutt, the respondent placed itself in a position in which it could not perform the contract, and for that reason should be held responsible for the payment of the notes at this time.

Our attention has been called to many decisions in which courts have announced the rule that, if one voluntarily puts it out of his power to do what he has agreed, he breaks his contract and is immediately liable to be sued therefor. The principle of law is sound when applied in proper cases. However, it has no bearing upon the factual situation presented in the case at bar.

Before respondent entered into the agreement with Garbutt, its officers had used every means within their power to bring the mine into production. The board of directors had exhausted the funds of the company and all those it could obtain from the stockholders. It had given appellant Vance a contract which he had performed to the best of his ability. It had endeavored to interest others in the business venture. All these

efforts were in vain. As a last resort, the officers entered into the agreement with Garbutt. The results obtained proved the wisdom of their action.

Garbutt, at an outlay of ninety-five thousand dollars, built a power line to the mine, erected a one hundred ton mill with suitable ore bins, put in a compressor and hoist, and made many other extensive improvements. At the time of the trial, the mill production was showing a profit. Appellants' situation is more favorable than at any time since the formation of the corporation. Respondent's ·board of directors has not put it out of the power of the company to pay its contracts. On the contrary, the company is in a much better position to pay all of those obligations, including the notes owing to appellants.

With respect to the clause in the production notes which provides,

" . . . except that in case of a voluntary or involuntary sale of its mining property, any balance unpaid hereon shall be paid out of the proceeds thereof before any distribution shall be made to its stockholders,"

we are of the opinion that it in no way strengthens the position of the appellants in their suit to recover upon their notes. In the first place, we do not feel that the transaction with Garbutt constituted such a sale as was contemplated by the quoted clause. In effect, it was actually a transaction whereby respondent was enabled to raise funds with which to install equipment which was necessary in order that profitable production might be begun, such transactions actually having been contemplated by the parties, as is shown by the definition of "net production receipts" in the notes themselves. The outcome of the transaction was that, instead of having an equity in the mining property itself, respondent became the owner of stock in the operating com-

pany to which that equity was transferred, but that stock, of course, represented an indirect interest in the assets of the new company. As for the fact that 5,001 of the 10,000 shares of the new company were owned by Garbutt, this did not detract from the fact that respondent retained a very substantial interest in the property, whose value was then considerably greater than it had been before the installation of the expensive equipment by Garbutt.

However, even if the transaction be regarded as a sale within the meaning of the clause in the production notes, we fail to see that a right of action has yet accrued to appellants. The provision in the note is to the effect that, in case of a sale of the property, any balances unpaid on the notes shall be paid out of the proceeds of the sale before any distribution is made to the stockholders in respondent company. It was not shown that there had yet been any proceeds realized from the transaction, the only thing received having been stock in the new operating company. No attempt had been made to realize upon that stock or to distribute any amounts thereof to the stockholders. As a matter of fact, it was contemplated that respondent company continue to operate with the assets realized by the transaction, and it was provided in the agreement of August 23, 1939, that the rights of holders of production notes be preserved under the new form of operation.

It is next urged that the notes should be paid within a reasonable time, inasmuch as the time of payment was not fixed. In support of this contention, appellants have cited *McIntyre v. Ajax Mining Co.,* 20 Utah 323, 60 Pac. 552. In that case, it was held that, if the net proceeds of ore sales did not, within a reasonable time, amount to a sum sufficient to liquidate the claims, the obligation was to become absolute.

478

However, the case is not applicable to the case at bar, inasmuch as the terms of the instruments in that case provided that payment be made out of net proceeds *or otherwise*, and it was because of the existence of the words "or otherwise" that the court arrived at its conclusion.

It is, of course, true that, although the payment of the notes was to be made out of net production receipts only, the promisor was under an obligation to make an attempt to realize such receipts, and that a failure to do so within a reasonable time would obligate respondent to pay the amounts thereof. 12 Am. Jur. 857, § 320; 13 C. J. 685, § 776; *Pritchard v. McLeod*, 205 Fed. 24. However, reasonable time must be measured by the circumstances in each individual case.

It is defined by Black's Law Dictionary (3rd ed.), 1730, as:

"Such length of time as may fairly, properly, and reasonably be allowed or required, having regard to the nature of the act or duty, or of the subject matter, and to the attending circumstances."

There is no evidence that the members of respondent's board of directors were tardy in the performance of their duties in attempting to bring the mine into production. On the other hand, it appears that they acted promptly in an endeavor to raise sufficient funds to accomplish that purpose.

The very nature of the corporation business indicates that a considerable length of time must elapse before the notes can be paid. Applying the definition quoted above, we conclude that a reasonable time has not expired since the date they were executed, and that the notes are not yet due.

The loans evidenced by the notes were made to respondent by its stockholders for the purpose of protecting their investments and in an endeavor to make

their stock earn dividends. Each of the appellants was either present or properly represented at the stockholders' meeting August 6, 1938, at which time the resolution authorizing the board to enter into a contract similar to the Garbutt agreement was approved. They must abide by their own agreement.

We hold that the production notes are not due, and that the trial court was justified in entering a judgment of dismissal in the first case.

■ Relative to appellant Vance's right to recover the amount due him for funds advanced, the trial court found:

"That plaintiff J. A. Vance began operating said mill under said contract in the fall of 1937 and continued to operate same until about the month of April, 1938. That the said fund of $30,000 had been practically exhausted by plaintiff Vance when said mill operations were started and in order to continue said operations, said plaintiff expended the sum of about $40,000 received from mint returns and in addition thereto the sum of $18,592.30 voluntarily advanced by him together with various other amounts aggregating approximately $6000 voluntarily advanced by other stockholders of defendant company, said monies being spent by plaintiff in paying the deficits arising from the excess mining and milling costs over the mint returns and in making the $10,000 payment on the purchase price of the property which became due November 1, 1937, about which plaintiff had personal knowledge long prior to its due date and payment of which sum could and should have been provided for by plaintiff Vance out of the production note fund or out of mint returns.

"That there was no express agreement or understanding of any kind between plaintiff or any others making such advances, and the Board of Directors of defendant company at the time of the advancement of said sums or any part thereof as to repayment thereof nor was any authority asked from or given by

said Board for such advances to be made, but that it was mutually agreed by the parties that such advances were to be repaid out of production in the same manner as the production notes, or in some other manner to be subsequently agreed upon by the parties.

"That at the times of making said advances plaintiff Vance knew that defendant company had no funds with which to repay same and had no prospect of securing funds therefor save out of net production receipts. That plaintiff at the time of making a part of said advances inquired of one of the Board of Directors of defendant company whether he thought plaintiff could get capital stock of the defendant company for such advances. That the plaintiff and other stockholders of defendant company who made advances similar to those made by plaintiff had no expectation of repayment therefor save out of net production receipts or in capital stock of defendant company.

"That plaintiff had at all times during the pendency of his service as general manager of defendant control of the funds of defendant company to the exclusion of its other officers and paid to himself out of said funds his personal expenses until about January 1, 1938, and that at the time of ceasing his services, to-wit, about July 1, 1938, there were ample funds in the bank at Bishop, California, subject to his check to pay the remainder of his personal expenses and that said funds were afterward withdrawn by him for other purposes."

Appellant contends that the money was advanced in good faith and with the knowledge and consent of his fellow members of the board of directors for the purpose of paying the debts of the company which had to be paid in order to maintain the company as a going concern. We agree with that statement. However, the real question relates to the method and time of repayment of the advances to appellant.

The advances made by appellant were as follows:

```
August   6, 1937............... $1,000.00
August 14, 1937...............   1,000.00
September   4, 1937............   2,000.00
September 17, 1937............   2,000.00
September 25, 1937............   2,000.00
October 18, 1937..............     400.00
November 1, 1937.............. 10,000.00
July  28, 1938.................     542.30
July  30, 1938.................      50.00
```

TOTAL ...................$18,992.30

It is evident that Vance and the other directors had in mind that the advances should be paid in the same manner as the production notes, that is, from net production receipts accruing from the sale of ores from the mining property.

At the time appellant advanced the sum of two thousand dollars in September, 1937, he asked Mr. Grill, a member of the board, whether he (Grill) "thought the board would issue him stock for additional advances which he would have to make." Grill told appellant that he would do what he could.

During the trial, appellant testified as follows:

"Q. Well, how did you expect yourself and Ferbert and Stiegler and anybody else who advanced money to be repaid? A. I didn't want to see a concern go broke because they were a little short of money. Q. I understand that. Did you give any thought to what would happen in event the mill didn't run profitably and what to do, then, about any money that was advanced? A. If it didn't run profitably, of course you would be out the money, I suppose."

Another circumstance which impels us to the conclusion that appellant advanced the funds with the understanding that he was to be repaid in production notes or stock is the contents of the minutes of the meeting of the board of directors held October 9, 1937, wherein we find the following:

"On motion duly made, seconded and carried, the following resolution was unanimously adopted:

"RESOLVED that any money advanced by Mr. J. A. Vance or any other director or stockholder for and on behalf of the company be paid back with interest at the rate of 6 per cent per annum from funds, as, if and when available, from operating profits from the mill, or, that upon Mr. J. A. Vance's return from the property some satisfactory arrangement be made to repay such advances in stock of the company."

These minutes, plaintiffs' exhibit 17, indicate that appellant was not present at the meeting, but they do show that he signed the minutes as a member of the board of directors. While it is true that the evidence does not indicate when appellant signed the minutes, we feel that he is bound by the contents of the exhibit, and the time when they were signed by him is immaterial.

Appellant was present at the next meeting of the board held January 8, 1938. At that time, as shown by plaintiffs' exhibit 18, the minutes of the meeting of October 9, 1937, were read and approved. It is clearly evident from all of the evidence introduced that appellant made the advances for the benefit of the respondent corporation for the purpose of keeping the mine in operation to the end that he, as a principal stockholder, would reap a profit thereby.

It is further evident that, at the time he made the advances, he, in company with the other directors, had in mind, and agreed, that the repayment would be made either in production notes or in stock of the company.

Since appellant Vance expected repayment of his advances to come from the operating profit of the mine, the only basis for a recovery would be a showing that there has been a failure to attempt to realize any profits within a reasonable time; and, as in the case

of the production notes, it is clear that there has been no such failure on the part of respondent.

As for the provision in the contract whereby Vance was made manager of the respondent company to the effect that Vance was to be entitled to full reimbursement for all expenses which he should incur in connection with his position as general manager, the expenses to be paid monthly, we deem it to be clear that only incidental expenses of a personal nature were contemplated by the parties.

The trial court was entirely correct in making its findings and in entering a judgment of dismissal.

Judgment affirmed.

BLAKE, C. J., BEALS, MILLARD, and JEFFERS, JJ., concur.

